UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BOMMARITO** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-204** |
| **BELLE CHASSE MARINE TRANSPORTATION, ET AL.** | **SECTION "L" (5)** |

### AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

This litigation arises out of injuries that Bosit Bommarito, III ("Mr. Bommarito") sustained on November 13, 2020 while in the course and scope of his employment as a welder with Belle Chasse Land Transportation. At the time of the incident, Mr. Bommarito was engaged in the construction of a foot dock or walkway. While standing on the dock, Mr. Bommarito was struck in the head and eye by a hook that was attached to the sling of a crane, which was located on a crane barge floating in the Mississippi River and being used in the construction of the dock. Mr. Bommarito was knocked off the dock and fell to the river batture below. Mr. Bommarito claimed injuries to his eye, skull, neck, shoulders, and back. Mr. Bommarito died on March 15, 2021, during the course of his treatment for these injuries, due to an overdose of drugs including fentanyl and xylazine.

Mr. Bommarito originally filed suit against his employer and the barge owner under the Jones Act and General Maritime Law. The complaint was later amended to include a claim under § 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. §901 *et seq*. After Mr. Bommarito's death, his surviving children and his mother were substituted as Plaintiffs and the complaint was amended to include a wrongful death claim and a

1

claim for bystander damages. The Court, on a motion for summary judgment, dismissed the Jones Act claim and the case proceeded under § 905(b) of the LHWCA.

The case was tried to the Court without a jury, commencing on April 4, 2022 and ending on April 5, 2022. The Court has carefully considered the testimony of all witnesses, the exhibits entered into evidence, and the relevant entries in the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court enters the following Findings of Fact and Conclusions of Law. To the extent that any findings of fact may be construed as a conclusion of law, the Court adopts them as such. To the extent that any conclusions of law may constitute findings of fact, the Court adopts them as such.

## I.    FINDINGS OF FACT

1. Belle Chasse Marine Transportation, LLC ("Marine") owns and operates a launch service on the lower Mississippi River, facilitating the transportation of personnel and goods to and from vessels traversing the river.

2. Marine owns and operates transport vessels and barges to conduct its work. Belle Chasse Land Transportation, Inc. ("Land") provides shore-side support for Marine's launch service business.

3. Marine and Land are closely related entities with the same ownership and upper management. Land does not have its own income; its expenses are paid by Marine. Land exists to provide services to Marine.

4. Land provides maintenance, repair, and construction work on Marine's infrastructure and vessels. Land employs a group of construction and repair workers to perform special projects.

5. Special projects include the construction of personnel docks, which are referred to as foot docks or walkways, to allow personnel to board their vessels.

6. In November of 2020, Land was building a foot dock at its Magnolia launch site on the Mississippi River. Marine's crane barge known as the OC 160 was used in this construction. The barge was approximately 130 feet in length and 30 to 40 feet in width. The barge was loaded with tools and materials from the Marine yard and towed to the work site by a tugboat. The workers arrived by trucks.

7. Mr. Bommarito was employed by Land as a welder on the Magnolia project. By November 13, 2020, the crew had already driven the pilings for the dock and installed the lateral I-beam supports. The next job was to lay out and install the grating for the walkway.

8. The grating consisted of 2-foot by 20-foot sections that had been fabricated in Marine's yard and transported to the work site by the OC 160 barge.

9. A two-lead sling was attached to the crane. At the end of each lead was a hook. These hooks were made at the Marine yard and were open hooks, without any latch.

10. The crew would attach one hook to one end of a section of grating and the other to the opposite end. The crane would then lift the section of grating off the deck of the barge and place it on the walkway supports.

11. Two sections of grating were laid side by side and welded together. The crew would then use a come-along to pull the grating along the I-beam supports to its final position.

12. To take some of the weight off and assist the workers in dragging the grating, the sling was hooked to the aft end of the grating; then, the crane would lift it slightly off the I-beam and the come-along would pull it into position.

13. Mr. Bommarito was assigned to signal the crane operator during this operation. However, because the hooks did not have latches, he had to hold on to each sling strap to remove the slack so the hooks would not slip out of the grating.

14. With his hands occupied, Mr. Bommarito was instructed to signal the crane operator by nodding his head to let the operator know when to raise the grating. Mr. Bommarito would then step away and use the appropriate hand signal to tell the crane operator when to stop.

15. On the morning of November 13, 2020, Mr. Bommarito was engaged in the above process. While he was holding the sling straps to keep the hooks attached to the grating, and before he could step away to give hand signals, the part of the grating to which one of the hooks was attached failed. The hook swung free and hit Mr. Bommarito in his head and eye. This impact knocked Mr. Bommarito off the walkway to the ground approximately 10 feet below.

16. As a result of this incident, Mr. Bommarito suffered injuries to his eye, skull, neck, shoulder, and cervical spine.

17. Mr. Bommarito's injuries included an eye socket fracture that caused his eye to be sunken. This injury caused blurred vision and pain when moving his eyes. This injury would have required two surgeries to repair, but these surgeries were delayed and Mr. Bommarito did not receive these surgeries before his death.

18. Mr. Bommarito's injuries also included a fractured vertebra in his neck and a tear in his shoulder. On December 10, 2020, Mr. Bommarito underwent surgery to realign his spine and replace a damaged disc.

19. Due to his injuries, Mr. Bommarito suffered from constant pain, especially in his eye, head, neck, and back. Because of his pain and inability to care for himself, Mr. Bommarito moved into his parents' home. He needed to rely on others for help with daily tasks including dressing and bathing.

20. Mr. Bommarito's mother, who cared for him after his injuries, documented his condition in a diary. The diary illustrates that, in addition to consistent pain, Mr. Bommarito suffered from depression, irritability, insomnia, urinary incontinence, and other symptoms that significantly diminished his quality of life due to his injuries.

21. Mr. Bommarito was unable to drive due to his injuries and rarely left his home after the accident.

22. Due to his injuries and surgery, Mr. Bommarito received prescriptions for drugs to reduce his pain, including oxycodone and tramadol, which are opioid painkillers.

23. On March 15, 2021, 122 days after the original incident, Mr. Bommarito died. His death resulted from an overdose of fentanyl, xylazine, and diazepam. Mr. Bommarito died in his parents' home and his mother attempted to resuscitate him by performing CPR.

24. Fentanyl is a synthetic opioid. Mr. Bommarito did not have a prescription for fentanyl. Xylazine is a tranquilizer typically used for horses. Xylazine is not available for prescription to humans.

25. Mr. Bommarito did not have a history of illicit drug use or substance abuse prior to his death. The evidence supports the conclusion that the reason he took the drugs that caused his overdose was to relieve the intractable pain caused by his injuries.

26. During his life, Mr. Bommarito maintained close relationships with his two children and his mother. The mother of Mr. Bommarito's children died in 2019, leaving Mr. Bommarito as his children's only parent. Mr. Bommarito's children were both minors at the time of his death; however, by the time of trial, his older child had reached the age of majority.

27. Though Mr. Bommarito's children lived with their maternal grandmother and did not live with Mr. Bommarito, he spoke to them daily and paid $350.00 per month for their support. He also frequently paid for gifts and other purchases for his children beyond this amount.

## II.  CONCLUSIONS OF LAW

### a. Jurisdiction

In this case, Plaintiffs seek recovery under § 905(b) of the LHWCA, which gives a covered worker a tort cause of action against a vessel or vessel owner for vessel negligence. 33 U.S.C. § 905(b). For this claim to be viable, it must be within the Court's admiralty jurisdiction. *See Margin v. Sea-Land Servs., Inc.*, 812 F.2d 973, 975 (5th Cir. 1987) (noting that § 905(b) does not provide an independent basis for admiralty jurisdiction). "[A] party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). First, the "location test" depends on "whether the tort occurred on navigable water or whether injury suffered on land was caused by

a vessel on navigable water." *Id.* The Admiralty Extension Act expressly provides that "[t]he admiralty and maritime jurisdiction of the United States . . . includes cases of injury or damage . . . caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101. To be caused by a vessel, the injury must be "caused by the vessel itself or its appurtenances." *Egorov, Puchinsky, Afanasiev & Juring v. Terriberry, Carroll & Yancey*, 183 F.3d 453, 456 (5th Cir. 1999). Additionally, if the injury was caused by an appurtenance of the vessel, the appurtenance must be defective. *Sea-Land*, 812 F.2d at 975. Second, the "connection test" depends on two issues: "whether the incident has 'a potentially disruptive impact on maritime commerce,'" and "whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'" *Id.* (quoting *Sisson v. Ruby*, 497 U.S. 358, 364-65 n.2 (1990)); *In Re Louisiana Crawfish Producers*, 772 F.3d 1026, 1029 (5th Cir. 2014).

Here, the location test is satisfied because Mr. Bommarito's injuries were "caused by a vessel on navigable water," even though they were suffered on land. *Grubart*, 513 U.S. at 534. Mr. Bommarito's injuries were caused by an inadequate and defective hook that hit him. The hook that caused Mr. Bommarito's injuries was attached to a crane, and the crane was attached to the OC 160 barge, whose purpose was to hold the crane. Thus, the hook that caused the injuries was an appurtenance of the barge. Moreover, the hook was defective because it lacked a latch, which required Mr. Bommarito to stand close to the load being lifted to hold the hook secure. The barge was on the navigable waters of the Mississippi River. Thus, as the Admiralty Extension Act contemplates, Mr. Bommarito's injuries, though they took place on land, were caused by a vessel on navigable water.

7

Further, the connection test is satisfied because the incident that injured Mr. Bommarito had "a potentially disruptive impact on maritime commerce" and the activity giving rise to it had a "substantial relationship to traditional maritime activity." *Id.* The incident that injured Mr. Bommarito—the unsecured hook striking him after the grating of the dock segment failed—disrupted the construction of the dock. The purpose of the dock was to facilitate Marine's business by allowing workers to board vessels on the Mississippi River. Thus, this incident had the potential to disrupt maritime commerce. The construction of the dock was also substantially related to traditional maritime activity. Case law has established that building or repairing a pier or dock is "maritime activity." *See Hullinghorst Indus., Inc. v. Carroll*, 650 F.2d 750, 756 (5th Cir. 1981); *Trotti & Thompson v. Crawford*, 631 F.2d 1214, 1221 (5th Cir. 1980). Therefore, the facts of the incident satisfy both the location test and the connection test and Plaintiffs' claims fit within the Court's admiralty jurisdiction.

Venue is proper in the Eastern District of Louisiana because "a substantial part of the events or omissions giving rise to the claim occurred" within this district.  28 U.S.C. § 1391 (b)(2).

### b. *Vessel Negligence*

At the time of the incident, Mr. Bommarito was constructing a dock adjacent to the Mississippi River, which was intended to allow access to vessels moored on the navigable waters of the river. Thus, Mr. Bommarito was a covered worker under the LHWCA. *See New Orleans Depot Servs., Inc. v. Dir., Off. of Worker's Comp. Programs*, 718 F.3d 384, 389 (5th Cir. 2013) (explaining that, to be covered under the LHWCA, an employee must meet the "situs" requirement, meaning the injury occurred on navigable waters or an adjoining area, and the "status requirement," meaning the employee was engaged in a traditional maritime occupation).

8

Under the LHWCA, in addition to a compensation claim, an employee may recover for a tort claim against the vessel owner for vessel negligence. Section 905(b) provides that a non-seaman maritime worker injured "by the negligence of a vessel" may bring an action against the vessel or the vessel owner. 33 U.S.C. §905(b). While the worker's employer "shall not be liable to the vessel for such damages directly or indirectly," the worker may bring negligence claims against the vessel owner. *Id.*; *see Aguilar v. Bollinger Shipyards, Inc.*, 833 F. Supp. 2d 582, 591 (E.D. La. 2011); *Jackson v. Lykes Bros. S. S. Co.*, 386 U.S. 731 (1967); *Reed v. S. S. Yaka*, 373 U.S. 410 (1963). The crane barge OC 160 is a vessel to which the provisions of § 905(b) apply. For purposes of the LHWCA, "the term 'vessel' 'includes every description of water-craft or other artificial contrivance used, or capable of being used, as a means of transportation on water.'" *Stewart v. Dutra Const. Co.*, 543 U.S. 481, 489 (2005). The barge meets this definition because it is used to transport a crane and other equipment on the Mississippi River. Moreover, it is irrelevant that the barge was moored and secured with a piling at the time of the incident—it is still a vessel even if it was being used as a stationary work platform at the time of the incident. *See Grubart*, 513 U.S. at 535 ("Even though the barge was fastened to the river bottom and was in use as a work platform at the times in question, at other times it was used for transportation.").

   The parties disagree as to which defendant was the vessel owner at the time of the incident. Plaintiffs argue that Marine and Land are effectively one entity and should both be considered the vessel owner, or, alternatively, that Marine was the vessel owner but had placed the vessel in Land's control as owner *pro hac vice*. Defendants argue that only Marine was the vessel owner and that Plaintiffs have no vessel negligence claim because Marine was not negligent and no claim is available against Land as Plaintiff's employer. However, the Court finds that Marine and Land have fused and are in reality the same company. The testimony of

9

Gordon Konrad, the corporate representative of both Marine and Land, demonstrated that the companies have the same leadership; that Marine is the sole owner of Land; that Land has no income of its own; and that Land only provides services to Marine. Thus, Marine and Land function as a single entity that was both the owner of the crane barge and the employer of Mr. Bommarito. A vessel owner who is the employer of an injured employee may still be liable for vessel negligence. *See Jackson*, 386 U.S. at 735.

Vessel owners owe three duties to workers: the "turnover duty," the "active control" duty, and the "duty to intervene." *Howlett v. Birkdale Shipping Co., S.A.*, 512 U.S. 92, 98 (1994) (citing *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 167 (1981)). The first duty, the turnover duty, has two parts: (1) "a duty to exercise ordinary care under the circumstances to turn over the ship and its equipment in such condition that an expert stevedore can carry on stevedoring operations with reasonable safety," and (2) "a duty to warn the stevedore of latent or hidden dangers which are known to the vessel owner or should have been known to it"—unless such dangers are "open and obvious" or "dangers a reasonably competent stevedore should anticipate." *Kirksey v. Tonghai Mar.*, 535 F.3d 388, 392 (5th Cir. 2008). The second duty, the active control duty, is a duty to prevent injury due to "hazards under the control of the ship." *Singleton v. Guangzhou Ocean Shipping Co.*, 79 F.3d 26, 28 (5th Cir. 1996). Its scope depends on whether the vessel owner had "operational control" of the area in question and of the stevedore's work "at the time of the activities in question." *Fontenot v. McCall's Boat Rentals, Inc.*, 227 F. App'x 397, 403 (5th Cir. 2007). The third duty, the "duty to intervene," "imposes liability 'if the vessel owner fails to intervene in the stevedore's operations when [the vessel owner] has actual knowledge both of the hazards and that the stevedore, in the exercise of 'obviously improvident' judgment means to work [despite the hazards] and therefore cannot be

relied on to remedy [them]." *Manson Gulf, L.L.C v. Mod. Am. Recycling Serv., Inc.*, 878 F.3d 130, 134 (5th Cir. 2017) (quoting *Burchett v. Cargill, Inc.*, 48 F.3d 173, 178 (5th Cir. 1995)).

Because Marine and Land, constituting a single entity, were both the vessel owner and Mr. Bommarito's employer, they acted in a "dual capacity" in the events that caused Mr. Bommarito's injuries. *Levene v. Pintail Enterprises, Inc.*, 943 F.2d 528, 532 (5th Cir. 1991). In such cases, the defendant is immune from liability for negligence "for acts taken in its capacity as an employer" and is only liable for vessel negligence in its capacity as the vessel owner. *Id.* Thus, Defendants may only be liable if they breached one of the three duties of vessel owners, not if they merely acted negligently in a general sense as Mr. Bommarito's employer.

The Court considers each of the three vessel owner duties and finds that the evidence supports the conclusion that Defendants breached the second and third duties. The Court finds that Defendants breached the active control duty by failing to prevent injuries to Mr. Bommarito due to hazards under the control of the vessel. Defendants had operational control of the crane, the dock area, and the task Mr. Bommarito was performing.  The crane was located on the vessel and was being operated by John Clulee, an employee of Defendants. The work on the dock area was being supervised by Mr. Gambino, also an employee of Defendants. The incident was caused by a hazard under the control of the barge because the hook—which was hazardous due to its lack of a safety latch—hit Mr. Bommarito after it was pulled by the crane, which was attached to the barge and operated by an employee of Defendants. There is no other entity that could have had operational control over the crane barge, the dock area, or Mr. Bommarito's work, and the hooks lacking safety latches posed a distinct hazard. Thus, Defendants breached the active control duty.

Defendants also breached the duty to intervene. Defendants failed to intervene in Mr. Bommarito's operations even though they knew of the hazards and knew that Mr. Bommarito was instructed or expected to follow a dangerous procedure despite the hazards. As Mr. Gambino, Defendants' project manager, admitted at trial, the procedure that Mr. Bommarito and Mr. Clulee were using to attach the hooks to the grating and operate the crane was unsafe and violated Defendants' own safety policies. Instead of holding the hooks onto the grating, which required him to use head signals instead of the required hand signals and to stand close to the grating while the crane was pulling the straps, Mr. Bommarito should have been instructed to use a technique that would have allowed him to use proper hand signals and to stand a safe distance away. As Plaintiffs' safety expert Mr. Borison testified, safer alternatives included using hooks with latches that would not have to be held onto the grating and having another worker use proper hand signals. Either Mr. Gambino or Mr. Clulee, who as the crane operator was responsible for the safety of jobs using the crane, should have stopped the work upon seeing that Mr. Bommarito was standing close to the grating while the crane was operating and was using head signals instead of proper hand signals. Thus, Defendants breached the duty to intervene.

Because Defendants breached two of the duties that vessel owners owe to workers, Defendants are liable for vessel negligence in their capacity as vessel owners.

    *c. Damages*

The Court finds that Plaintiffs are entitled to the following categories of damages.

    *i. Survivor Damages*

Plaintiffs are entitled to survivor damages for Mr. Bommarito's pain and suffering between the incident on November 13, 2020 and his death on March 15, 2021. The evidence at trial showed that Mr. Bommarito experienced significant pain and suffering during this period of

122 days. Dr. D'Antoni Dennis, a surgeon specializing in facial trauma who examined Mr. Bommarito, testified that due to the fracture in his eye socket caused by the incident, Mr. Bommarito's right eye was sunken, he had blurry vision, and he experienced frequent pain when moving his eyes. Dr. Dennis also testified that Mr. Bommarito's facial fractures likely affected his nasal cavity and caused difficulty breathing. In addition to his facial fractures, Mr. Bommarito sustained injuries to his neck and back. Dr. John Steck, the neurosurgeon who performed surgery to realign Mr. Bommarito's spine and replace a disk in his neck on December 10, 2020, testified that Mr. Bommarito's neck injury caused significant pain and required a prescription for painkillers.

Further, the testimony of Mr. Bommarito's mother Susan Bommarito, who kept a diary detailing her son's pain and health problems after the incident, illustrated that Mr. Bommarito suffered from constant pain during this period and needed help with routine tasks. Mrs. Bommarito testified that, after the incident and the surgery, her son frequently complained of pain, had to wear a neck brace at all times other than bathing, and struggled to find a comfortable position for sitting or sleeping (at one point attempting to sleep on the floor, which was still painful). Mrs. Bommarito also testified that her son experienced painful swelling in his neck (including a hard lump "almost the size of a baseball"), had problems with "dizziness and loss of balance," had trouble swallowing, suffered from urinary incontinence, and was frequently depressed and irritable. Further, Mrs. Bommarito testified that Mr. Bommarito "couldn't do anything for himself . . . because of the pain" and "was dependent on other people . . . for his main everyday routines," including dressing and bathing. Mrs. Bommarito also testified that her son was incapable of driving due to his blurred vision and neck pain and very rarely left her house after the incident.

Further, Mr. Bommarito's elder child testified that Mr. Bommarito rarely got to see his children after the incident because his injuries made him incapable of doing the activities he previously enjoyed with his children. Specifically, Mr. Bommarito's child testified that, after the incident, Mr. Bommarito only got to see his children for "a few days" and could not participate in their usual activities because he was "sluggish," "depressed," and "always in pain."

The Court finds that an award of $48,800.00, to be split evenly among Mr. Bommarito's two children and his mother, is appropriate compensation for Mr. Bommarito's pain and suffering between the incident and his death. This amount is based on a rate of $400.00 per day for the 122 days between the incident and Mr. Bommarito's death. This rate is based on comparable cases, but is larger than the awards in those cases to reflect the multiple injuries Mr. Bommarito sustained and the severity of his pain. *See Matter of Lasala*, No. CV 18-11057, 2021 WL 5039639, at *8 (E.D. La. Oct. 29, 2021) (awarding damages amounting to $273.43 per day for pain and suffering of plaintiff who suffered serious leg injuries, was wheelchair-bound, and could no longer enjoy the activities he had enjoyed with his family); *Associated Terminals of St. Bernard, LLC v. Potential Shipping HK Co.*, 324 F. Supp. 3d 808, 836 (E.D. La. 2018) (awarding damages amounting to $239.61 per day for pain and suffering of plaintiff who had neck and back pain and other symptoms); *Daigle v. L & L Marine Trans. Co.*, 322 F. Supp. 2d 717, 732 (E.D. La. 2004) (awarding damages amounting to $376.88 per day for pain and suffering of plaintiff who suffered neck and back injuries requiring surgery, had depression and insomnia, and could no longer participate in activities he had enjoyed).

### ii. *Wrongful Death and Loss of Consortium*

Plaintiffs are entitled to damages for Mr. Bommarito's wrongful death. The evidence at trial showed that Mr. Bommarito took the drugs that caused his fatal overdose only to cope with

the intractable pain from his injuries after he ran out of prescription opioid painkillers, which his doctors had prescribed only for a limited time. There was no evidence that Mr. Bommarito had previously used illegal drugs or had a substance abuse problem; to the contrary, he passed a drug test when applying to work for Defendants. Further, Dr. Dana Troxclair, the forensic pathologist who performed an autopsy on Mr. Bommarito, testified that Mr. Bommarito's overdose may have resulted from taking fentanyl only one time. Dr. Troxclair testified that fentanyl is often mixed with xylazine when sold on the street or over the Internet. Dr. Troxclair further testified that she has seen many cases where people with chronic pain who had been prescribed opioid painkillers, like Mr. Bommarito, later sought fentanyl to deal with their pain and suffered overdoses shortly thereafter. Given these facts, the Court finds that Mr. Bommarito's overdose was not a separate, intervening cause of his death, but rather was a direct consequence of his injuries from the accident and the pain those injuries caused him.

Further, the evidence at trial showed that Mr. Bommarito maintained close relationships with his two children and his mother. Mr. Bommarito's elder child, Bosit Bommarito IV ("Bosit"), who was sixteen years old when his father died, testified that, before he was injured, Mr. Bommarito spent nearly every weekend with his children, called them every day, cooked for them, played games with them, and was a mentor who "tr[ied] to teach [his children] new skills" and "g[ave] [them] life lessons." Bosit testified that his father "was everything to me" and was "the only thing I had left after my mom died." Further, Mrs. Bommarito testified that she was "very close" to her son, that he called her every day and "shared everything" with her, and that he spent time with her "basically on every holiday and every weekend." At the time of his death, Mr. Bommarito was 48 years old and had a life expectancy of approximately 73 years. *See* Elizabeth Arias, Jiaquan Xu, Betzaida Tejada-Vera, and Brigham Bastian, *U.S. State Life Tables*

*2019*, 70 National Vital Statistics Reports 18 (Feb. 10, 2022), https://www.cdc.gov/nchs/data/nvsr/nvsr70/nvsr70-18.pdf (estimating the life expectancy of a man in Louisiana at 72.8 years). Thus, Mr. Bommarito's family members have lost approximately 25 years of love and affection due to his wrongful death.

The Court finds that $450,000.00—comprised of $200,000.00 for each of Mr. Bommarito's two children and $50,000.00 for Mr. Bommarito's mother—is an appropriate amount to compensate Plaintiffs' loss of consortium. This amount is based on comparable cases awarding damages for loss of consortium due to wrongful death, but adjusted upward to account for the gravity of the loss for Mr. Bommarito's children given that his wrongful death left them orphaned. *See, e.g., Randall v. Chevron U.S.A. Inc.*, 13 F.3d 888 (5th Cir. 1994) (awarding decedent's two children $100,000 and $150,000, respectively, for the wrongful death of their father); *Estate of Ponce v. M/V Altair*, 493 F. Supp. 2d 880 (5th Cir. 2007) (awarding $105,000 to the decedent's child for loss of consortium).

### iii. Loss of Support

Mr. Bommarito's children are entitled to damages for loss of support. The evidence at trial showed that Mr. Bommarito provided money for his children's daily expenses and frequently paid for gifts, outings, and other miscellaneous purchases for his children. Sheila Callais, the maternal grandmother of Mr. Bommarito's children, with whom they live, testified that Mr. Bommarito gave her $350 every month for his children's expenses and frequently paid for additional purchases for his children.

The Court finds that $33,600.00, split evenly between Mr. Bommarito's two children, is an appropriate amount to compensate them for loss of support. This amount is based on Mr. Bommarito's payments of approximately $700 per month (comprised of the $350 Mr.

16

Bommarito provided for his children's expenses each month plus $350 for additional purchases for his children each month) over 50 months (the length of time between Mr. Bommarito's death and the date his younger child will reach the age of majority), reduced to the present value (based on an interest rate of one percent).

### iv. Estate Expenses

The Court finds that Mr. Bommarito's estate is entitled to $7,815.00 in damages for funeral expenses and ambulance expenses.

### v. Past Medical Expenses

The Court finds that Plaintiffs are entitled to $35,453.09 in damages for past medical expenses.

### vi. Pre-Judgment Interest

The Court finds that Plaintiffs are entitled to pre-judgment interest from the date of Mr. Bommarito's death on March 15, 2021 to the date of Judgment. "In admiralty, the court has the discretion to award pre-judgment interest. In this Circuit, there is a strong presumption in favor of awarding pre-judgment interest, and it will usually only be denied in cases where the plaintiff exercised undue delay in bringing his action." *Daigle v. L & L Marine Trans. Co.*, 322 F. Supp. 2d 717, 732 (E.D. La. 2004) (citing *U.S. v. Ocean Bulk Ships, Inc.*, 248 F.3d 331, 344 (5th Cir. 2001)). In admiralty cases, courts have "broad discretion" in setting the pre-judgment interest rate. *Drinnon Marine, LLC v. Four Rivers Towing of Alabama, LLC*, 549 F. Supp. 3d 505, 518 (E.D. La. 2021). The Court finds that an appropriate pre-judgment interest rate is the judicial interest rate in Louisiana at the time of Mr. Bommarito's death on March 15, 2021, which was 3.5 percent, compounded annually.

### vii. Damages Not Available

The Court finds that Plaintiffs are not entitled to punitive damages. Punitive damages may be recoverable in claims brought under the LHWCA. *See In re Rodi Marine LLC*, No. CV 17-5394, 2019 WL 861251, at *3 (E.D. La. Feb. 22, 2019) (noting that the Fifth Circuit has left open the question of whether punitive damages are available under § 905(b) and that district courts within the Fifth Circuit have found that punitive damages are recoverable under the LHWCA). However, to receive punitive damages, a plaintiff must show the defendant's actions were "more than merely negligent" by showing "gross negligence, reckless or callous disregard for the rights of others, or actual malice or criminal indifference." *Id.* (internal quotations omitted). Plaintiffs have not met this burden—they have merely shown that Defendants were negligent.

The Court further finds that bystander damages are not available. While Plaintiffs initially sought damages for Mrs. Bommarito's emotional pain and suffering for being a bystander to her son's death, Plaintiffs did not request bystander damages in their trial brief. Moreover, case law suggests that, under the LHWCA, bystander damages are only available to those who were present at the scene of the injury. *See, e.g., Dierker v. Gypsum Transp., Ltd.*, 606 F. Supp. 566 (E.D. La. 1985).

### viii. Total Amount of Damages

The total amount of damages to be awarded to Plaintiffs is $575,668.09, plus pre-judgment interest at 3.5% (compounded annually) for the period between Mr. Bommarito's death on March 15, 2021 and the date of Judgment, and post-judgment interest at the judicial rate from the date of Judgment.

### III. CONCLUSION

The Court summarizes its holdings as follows:

1. Plaintiffs' claim for vessel negligence under § 905(b) of the LHWCA is within the Court's admiralty jurisdiction because Mr. Bommarito's injuries were caused by a vessel on navigable water, the incident had a potentially disruptive impact on maritime commerce, and Mr. Bommarito was engaged in work that had a substantial relationship to traditional maritime activity when he was injured.

2. Defendants are liable for vessel negligence in their capacity as the vessel owner because they breached (1) the active control duty, by failing to prevent injuries to Mr. Bommarito due to hazards under the control of the vessel; and (2) the duty to intervene, by failing to intervene in Mr. Bommarito's operations even though they knew of the hazards and knew that Mr. Bommarito was instructed or expected to follow a dangerous procedure despite the hazards.

3. Plaintiffs are entitled to damages including: survivor damages for Mr. Bommarito's pain and suffering; loss of consortium due to Mr. Bommarito's wrongful death; loss of support; estate expenses; and past medical expenses. The total amount of damages is $575,668.09, plus pre-judgment interest and post-judgment interest, to be apportioned as described in the Damages section above.

New Orleans, Louisiana, this 10th day of June, 2022.

_Eldon E. Fallon_
UNITED STATES DISTRICT JUDGE